## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| **JEFFREY MADISON, RYAN DOWNTON,** | § | |
| **PEGGY BORGFELD, KEVIN OWENS et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| *v.* | § | **Case No. 20-835** |
| | § | |
| **HEALTH CARE SERVICES** | § | |
| **CORPORATION, d/b/a BLUE CROSS AND** | § | |
| **BLUE SHIELD OF TEXAS,** | § | **JURY DEMAND** |
| | § | |
| **Defendant.** | § | |

### PLAINTIFFS JEFFREY MADISON, RYAN DOWNTON, PEGGY BORGFELD, KEVIN OWENS, JEFF AND ASHLEY MADISON TRUST, AND KEVIN J. OWENS MANAGEMENT TRUST'S ORIGINAL COMPLAINT

Plaintiffs Jeffrey Madison, Ryan Downton, Peggy Borgfeld, Kevin Owens, Jeff and Ashley Madison Trust, and Kevin J. Owens Management Trust complain of Defendant Health Care Services Corporation d/b/a Blue Cross & Blue Shield of Texas ("***BCBSTX***"), and in support thereof would show:

### I.
### PARTIES

1.     Plaintiff Jeffrey Madison is a Texas resident residing at 201 Dovetail Cove, Georgetown, Texas 78628.

2.     Plaintiff Ryan Downton is a Puerto Rico resident residing at 6300 Isla Verde Ave, Apt. 907, Carolina, Puerto Rico 00979.

3.     Plaintiff Peggy Borgfeld is a Texas resident residing at 2378 County Road 320, Lexington, Texas 78547.

4.     Plaintiff Kevin Owens is a Texas resident residing at 5525 FM 2340, Burnet, Texas 78611.

5.      Plaintiff Jeff and Ashley Madison Trust is a Texas Trust, with an office at 201 Dove Tail Cove, Georgetown, Texas 78628.

6.      Plaintiff Kevin J. Owens Management Trust is a Texas Trust, with an office at 5525 FM 2340, Burnet, Texas 78611.

7.      Defendant BCBSTX is an Illinois Mutual Legal Reserve Company with its principal place of business at 300 E. Randolph St., Chicago, Illinois 60601. BCBSTX provides health insurance to businesses and individual insureds in the State of Texas.

## II.  JURISDICTION AND VENUE

8.      The damages sought by Plaintiffs are within the jurisdictional limits of this Court. The Court has jurisdiction due to the diversity of the parties and the amount in controversy pursuant to 28 U.S.C. § 1332.

9.      This is also a complaint under the Lanham Act, 15 U.S.C. §§ 1114, et seq., and certain related state law claims.  This Court has original subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338, and 1367.

10.      Venue is proper in the Western District of Texas pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to the claim occurred in the Western District of Texas, Defendant continuously and purposefully does business in this District, and five of the plaintiffs reside in this District.

## III.  FACTS

### A.      Plaintiffs Develop a Profitable Rural Healthcare System

11.      America today, and especially Texas, is facing a crisis in rural healthcare.  In the 1960s, Texas had 300 rural hospitals, but only 158 remain open today.  Texas also leads the nation in rural hospital closures, with 22 in the last decade alone.  The average Texas hospital closure

results in 170 lost jobs and $22 million in lost annual payroll.[1]

12.     Rural hospitals face a myriad of challenges including declining patient populations, disparate rates of uninsured patients, and below-cost reimbursement for services provided to Medicare and Medicaid patients.  In short, rural hospitals are only able to survive because private insurers have an obligation to pay rural hospitals 100% of their billed charges – or negotiate a contract giving the insurance company (and its insured beneficiaries) a reasonable discount.

13.     In the early 2000s, Madison was the CEO of a small rural hospital in Rockdale, Texas.  He negotiated with Rockdale Blackhawk, LLC to take ownership of operation of the Rockdale Hospital, where he continued to serve as CEO.  Owens invested in Rockdale Blackhawk, LLC and subsequently, worked with Downton to acquire ownership of Rockdale Blackhawk, LLC. In 2010, Owens changed the name of Rockdale Blackhawk, LLC to Little River Healthcare ("*Little River*").  Plaintiffs are now the ultimate owners of Little River.

14.     Beginning in 2013, Plaintiffs recognized that Little River needed to expand beyond its main campus in Rockdale, Texas to survive.  Little River began employing physicians up and down the I-35 corridor and expanded hospital outpatient services including, but not limited to, diagnostic imaging, surgical, and laboratory services.[2]  As part of Little River's expanding laboratory services, Plaintiffs built an entire new wing on to the Little River hospital for expanded laboratory service capabilities.  Providing all of these services to patients outside of Milam County allowed Little River to both cover losses and expand on-campus services in Rockdale.  Little River was one of a very small number of rural hospitals able to offer its medically underserved population

---

[1] https://www.torchnet.org/advocacy--rural-hospital-closure.html.
[2] Publicly available article accessible at: https://www.captodayonline.com/value-hospital-lab-outreach-underrated/ (last accessed September 13, 2020) ("Moreover, successful hospital laboratory outreach can furnish more than half of a hospital's pre-tax earnings while accounting for less than 10 percent of its overall cost.  It's one of the best-kept secrets in health care."); https://revcycleintelligence.com/news/transforming-the-hospital-laboratory-into-a-profit-center ("Hospitals that have been able to effectively institute laboratory outreach programs have awoken the sleeping giant.").

cardiac diagnostic and interventional catheterizations, as well as total joint replacement orthopedic surgery in a rural community.  It was also in the process of expanding its spine surgery capabilities and procuring the needed high tech lab equipment and supporting lab operating software needed to operate a fully accredited highly complex laboratory.

15.     Plaintiffs successfully grew their business, with Little River's operating income exceeding $36 million in 2015.  Plaintiffs planned to continue expanding by building a surgery center in Georgetown, Texas in 2017 (the "***Georgetown Surgery Center***").  Plaintiffs, through an entity other than Little River, had already acquired the land and secured development commitments.  Plaintiffs were each going to individually invest in the Georgetown Surgery Center. The annual profits from the Georgetown Surgery Center would have exceeded $8 million.

16.     In 2016, Plaintiffs also began pursuing a majority recapitalization of Little River, whereby Plaintiffs would sell a majority of their equity in Little River to a private equity group. Plaintiffs met with four investment banks, each of which valued the equity of Little River in excess of $350 million.  Plaintiffs retained the Cain Brothers investment bank to assist in the anticipated transaction.  In January 2017, Madison and Downton traveled to the JP Morgan Healthcare Investment Conference in San Francisco, California and met with approximately ten private equity groups with capital sufficient to buy the majority of Plaintiff's equity interest in Little River. Madison and Downton presented the Little River model to the private equity groups.  At least seven of the groups expressed interest in continuing in the bidding process for the purchase of Little River, with a plan to expand Little River's proprietary "physician practice lease" model nationwide.  Plaintiffs were also considering investments in other non-Texas rural hospitals, including one in Colorado.  None of those hospitals would have been subsidiaries of Little River.

17.     Unfortunately, in 2016, as part of its campaign against Texas rural hospitals,

BCBSTX wrongfully withheld payment of tens of millions of dollars it owed Little River for services provided to BCBSTX insureds.  As detailed below, BCBSTX also initiated a wrongful smear campaign against Little River and its owners, including wrongful allegations of fraud.  Due to BCBSTX's nonpayment and lies about Little River, Plaintiffs were forced to stop the sale process and abandon plans to build the Georgetown Surgery Center in 2017.

18.     In 2018, Little River filed for arbitration against BCBSTX for breach of contract, violation of the Texas Prompt Pay Laws, and other claims (the "*Arbitration*").  BCBSTX counterclaimed for breach of contract and fraud.  Little River also filed for bankruptcy and subsequently closed all of its hospitals and other medical facilities.  In 2020, retired Texas Supreme Court Justice Harriet O'Neill, acting as arbitrator, found BCBSTX liable for $108 million for breaching its contracts with Little River and violating the Texas Prompt Pay Laws (as set forth in the "*Final Award*").[3]  Justice O'Neill also denied BCBSTX's counterclaims in their entirety.[4]  Judge King in the Western District of Texas Bankruptcy Court entered final judgment against BCBTSX.[5]  BCBSTX did not appeal the Final Award and agreed to the final judgment.[6]  Accordingly, BCBSTX's breach of its contracts with Little River and the fact that Little River did not commit fraud have been conclusively established in this case as a matter of law.

**B.     BCBSTX's Campaign to Target Rural Hospitals and Exacerbate the Rural Healthcare Crisis in Texas.**

19.     As an insurance provider that competes for government business in Texas, BCBSTX prides itself on its ability to offer in-network care in all 254 Texas counties.  In rural

---

[3] Ex. A, Final Award in Case No. 01-18-0001-136, *Rockdale Blackhawk, LLC d/b/a Little River Healthcare v. Blue Cross & Blue Shield of Texas*, before the American Arbitration Associated, Retired Texas Supreme Court Justice Harriett O'Neill presiding as arbitration (the "Final Award"), at ¶¶ 1-5.
[4] Final Award at ¶¶ 134-136 ("Little River complied with the contractual terms;" "Little River did not commit fraud or fraudulent inducement.").
[5] Ex. B, Final Judgment at p. 2.
[6] *Id.*

counties that have only one hospital, BCBSTX must contract with that rural hospital to maintain "network adequacy."

20.    At first glance, it would appear that BCBSTX needs rural hospitals and, indeed, BCBSTX gives public lip service to the *idea* that it cares about rural healthcare.  On the other hand, BCBSTX can save money if rural hospitals close and the patients are diverted to more distant, urban hospitals, since BCBSTX generally pays higher rates to rural hospitals than their urban counterparts.  The requirement to offer local in-network hospital care in all 254 Texas counties does not apply in counties where there is no hospital.  On information and belief, every time a rural hospital faces the threat of closure due to a low contract offer from BCBSTX, BCBSTX performs an internal analysis showing how much money it can save by diverting all of those patients to other, more distant, hospitals.  BCBSTX will also save money if rural patients put off medically necessary healthcare due to the lack of a local provider and local services.

21.    At least as early as 2016, BCBSTX began a campaign targeting rural hospitals in Texas, seeking to reduce their reimbursement rates, force them to eliminate lawful services, and, ultimately, drive them out of business while also increasing BCBSTX profits.  In driving rural hospitals out-of-business, BCBSTX has negatively impacted: (1) the availability of care for rural patients; (2) the quality of care for rural patients; (3) the investment market in Texas rural healthcare; and (3) the employment market for persons who work for rural hospitals.

22.    BCBSTX was aware the public would suffer if its strategy succeeded, but it continued undeterred, targeting hospitals it could subdue without fear of public reprisal.  BCSBTX wrongfully directs its employees to use regulators and legislators as leverage against rural hospitals to force them to reduce services and accept lower reimbursement rates.

23.    BCBSTX realized that one way to force a hospital to accept lower rates was to tell

other insurers, regulators, legislators, and doctors that the hospital was committing fraud. However, BCBSTX had a duty to refrain from lumping in compliant hospitals, like Little River, with the bad actors.  In bad faith and/or with malice, BCBSTX reported at least Little River and, on information and belief, other providers for fraud as part of its inappropriate pressure tactics seeking to avoid payment obligations.[7]  Most hospitals cave to BCBSTX's inappropriate pressure tactics and agree to stop providing lawful services (because BCBSTX does not want to pay for them) and to sign lower contracts—even contracts that reimburse less than a hospital's cost of treating patients.

24.     During the same time period at issue here, publications reported that numerous rural Texas facilities were struggling to survive BCBSTX's strong-arm contracting tactics:[8]



25.     BCBSTX particularly wanted to drive rural hospitals out of laboratory operations. As hospital operators around the country were recognizing they had "the potential to significantly decrease healthcare costs and boost revenue through laboratory outreach programs."[9]  However,

---

[7] *See, e.g., Knox County Hospital District v. Health Care Services Corporation d/b/a Blue Cross Blue Shield of Texas*, Northern District of Texas, Cause No. 7:19-cv-00095; *Experience Infusion Center, LLC v. Health Care Service Corporation*, Southern District of Texas, Cause No. 3:16-cv-00199.
[8] Publicly available article accessible at: https://www.texasobserver.org/struggling-rural-hospitals-say-theyre-being-preyed-upon-by-blue-cross-blue-shield/ (last accessed September 13, 2020), and attached hereto as Exhibit C.
[9] Publicly available article accessible at: https://revcycleintelligence.com/news/transforming-the-hospital-laboratory-

hospitals performing outreach lab services compete with BCBSTX's preferred laboratory provider, Quest Diagnostics ("*Quest*").   On information and belief, improperly using confidential information concerning hospitals' referral relationships, BCBSTX directed Quest to market to physicians who referred laboratory specimens to hospitals to encourage them to switch their referrals from the hospitals to Quest.

26.    BCBSTX also identified hospital employment of physicians and similar employment-type relationships as a business practice detrimental to BCBSTX's profitability.  As a result, BCBSTX knowingly took actions to interfere with potential contractual relationships between hospitals and physicians.  In addition, BCBSTX began competing with hospitals by employing physicians in Texas, with plans to open at least 10 primary care practices in 2020 under the mantra, "if you can't beat 'em, buy 'em."[10]  BCBSTX will almost certainly direct all of its employed physicians to refer all of their laboratory patients to Quest.  By forcing hospital closures, BCBSTX eliminates competitors in the physician employment market.

### C.    BCBSTX Targets Little River

27.    BCBSTX noticed Little River's tremendous growth between 2013 and 2015, investigated Little River's claims at that time, found no issues, and generally paid claims. However, by 2016, BCBSTX decided it was paying Little River too much money and took action to reduce its exposure to Little River.  A central facet of Little River's proprietary growth strategy involved contracting with physicians through a practice lease model.  As set forth above, BCSBTX opposed contractual relationships between hospitals and physicians and sought ways to stop or minimize them.  Recognizing that a significant portion of Little River's growth came from laboratory services, BCBSTX started a larger investigation into Little River's laboratory practices

---

into-a-profit-center (last accessed September 13, 2020).
[10] https://www.modernhealthcare.com/insurance/blue-cross-joins-doctors-practice-party.

in early 2016.  Effective June 7, 2016, in violation of Texas law, BCSBTX stopped paying Little River for certain laboratory services using an internal audit program called "prepayment review."

28.    BCBSTX's prepayment review audit violates Texas law requiring an insurance company to pay all claims prior to auditing them.[11]

29.    On June 8, 2016, Downton explained to BCBSTX why its laboratory services complied with both the law and the contracts.[12]  Rather than accepting (or challenging) Downton's explanation, BCBSTX sent a report to the U.S. Department of Health and Human Services Office of Inspector General ("OIG") accusing Little River of committing fraud—based not on any violation of the law, but based on BCBSTX's conveniently incorrect interpretation of one of its own policies.  It remains unclear why a potential violation of an internal company policy would trigger a report to the OIG.[13]

30.    Significantly, in its report to the OIG, BCBSTX made no mention of Downton's explanation of regulatory (and contractual) compliance, which its lead investigator had received by phone only a day earlier.[14]

31.    BCBSTX's decision to withhold Downton's explanation in BCBSTX's report to the OIG constitutes bad faith and/or malice.

32.    On July 20, 2016, BCBSTX met with Madison and Downton to discuss the laboratory dispute.  At that time, BCBSTX delivered notice of contract termination, without cause, and proposed a new contract with a reimbursement reduction exceeding 80%.  Internally, BCBSTX discussed Little River's laboratory activities not as illegal, fraudulent, or a contractual breach, but

---

[11] Ex. A, Final Award, at ¶ 115 ("BCBSTX further violated the [Texas Prompt Pay Laws] by failing to first pay 100% of the claims [prior to conducting the audit];" TEX. INS. CODE §§ 843.338, 843.346, 1301.103; 28 TAC §§ 21.2802, 21.2807.
[12] *Id.* at ¶65.
[13] Justice O'Neill concluded that Little River had not actually violated any BCBSTX policy. *Id.* at ¶¶ 63-72.
[14] *Id.* at ¶130 ("BCBSTX was less than forthright by failing to convey Little River's explanation of its billing practices and its belief that they were fully compliant with CMS regulations.").

as a "loophole" that could be "plugged" with new contracts.[15]  In addition to its illegal prepayment review, BCBSTX also improperly recouped approximately $9.1 million from Little River, exacerbating Little River's cash-flow problems caused by BCBSTX's unlawful prepayment review.[16]

33.     Ultimately, Little River reluctantly agreed to a new contract at a more than 50% reduction in reimbursement (the "***New Contracts***") based on the belief that the new contracts would help ensure BCBSTX stopped its wrongful denial of Little River's laboratory claims.  Instead, unbeknownst to Little River, BCBSTX actually expanded its "lock" on payment to Little River. BCBSTX admits that its intent in renegotiating the contracts was to "disincentivize" Little River from performing lab services.[17]  At the same time, BCSBTX knew that Little River's ability to survive under the New Contracts was contingent on maintaining (or increasing) the volume of services it provided.  If Little River had, in fact, stopped providing lab services, it would have begun losing money on every BCBSTX patient it treated.  Yet BCBSTX did not really care if Little River closed, because on information and belief, it had already modeled the "savings" it would obtain if Little River closed.  Essentially, BCBSTX engineered a situation where it could give lip service to its support for rural healthcare through an in-network contract with Little River, while actually forcing Little River to reduce services and, ultimately, close its hospitals.

34.     Plaintiffs determined that Little River's survival depended on maintaining its growth strategy, including the growth of laboratory services.[18]  Unfortunately for Plaintiffs, when

---

[15] *Id.* at ¶68.

[16] *Id*. at ¶95.

[17] *Id.* at ¶126.

[18] "As hospitals are buying other hospitals, that creates a better math for them to be in the lab business, the business is all about scale, and it's all about high fixed cost low variable cost."  Publicly available article accessible at: https://www.360dx.com/clinical-lab-management/hospitals-explore-new-models-labs-post-pama#.XyFma55KhhE (last accessed September 13, 2020); "The good thing about laboratory outreach is that as your test volumes grow, your unit per test decreases because you're able to generate economies based on higher volumes." https://revcycleintelligence.com/news/transforming-the-hospital-laboratory-into-a-profit-center.

the payment rates in the New Contracts failed to "disincentivize" Little River, BCBSTX decided

to wrongfully deny payment for Little River's laboratory services despite the new contract it had

signed with Little River, ultimately wrongfully withholding approximately $65.1 million between

2016 and 2017.[19]  Facially, BCSBTX based most of its denials on an incorrect assertion that Little

River did not have laboratory equipment sufficient to perform the testing on its own campus.

35.    In June 2017, a Little River affiliate, Timberland Healthcare, LLC closed its

Timberlands Hospital in Crockett, Texas due to nonpayment from BCBSTX.  Around the same

time, Downton told BCBSTX that Little River's remaining hospitals were in danger of closure

unless BCBSTX began paying Little River according to the Contracts.  On information and belief,

BCBSTX issued an internal directive to deny all Little River laboratory claims with a notation that

Little River did not process the tests on its Rockdale campus.  In response to more complaints from

Little River, several BCBSTX employees investigated the claim denials and realized that medical

records demonstrated that the tests had, in fact, been performed in Rockdale—meaning BCBSTX's

denials were in error.  Yet, rather than correct the error and pay Little River's claims, BCBSTX

doubled down and accused Little River of fraud.

36.    First, in response to a newspaper quoting Downton blaming the facility closure on

BCBSTX's failure to pay more than $32 million in Little River claims, BCBSTX issued a

statement implying wrongful actions by Plaintiffs and Little River, stating, "this is not done yet"

and "[b]ecause this is an open investigation we cannot comment further."[20]  In fact, at this time,

BCBSTX had already concluded that Little River was, in fact, providing the relevant lab services

on its own campus.  Second, in July 2017, BCBSTX made a presentation to other third-party

---

[19] BCSBTX's breach of the contracts has already been conclusively determined and is not at issue in this proceeding.  Ex. A, Final Award at ¶1.
[20] https://messenger-news.com/2017/06/28/2blue-cross-issues-statement-regarding-lrh-allegations/.

payors, including, but not limited to, Aetna, Cigna, Humana, and United, accusing Little River of fraud and directing the other insurers to target Little River and other rural hospitals for contractual rate reductions.[21]  Third, BCBSTX sent communications to the Centers for Medicare and Medicaid ("CMS") accusing Little River of fraud.[22]  Fourth, on information and belief, BCBSTX contacted members of the Texas Legislature and employees of the Texas Department of Insurance (collectively, "Texas Officials") and accused Little River of committing fraud.  On information and belief, prior to the time BCBSTX accused Little River of fraud, BCBSTX had actual and/or constructive knowledge that it was wrongfully denying Little River claims.  As a result, these assertions were made in bad faith and/or with malice.

37.     BCBSTX's accusations against Little River percolated through the Texas medical community.  On information and belief, BCBSTX was a source for multiple articles in the publication "Modern Healthcare" wrongfully accusing Little River of engaging in a "laboratory billing scheme."[23]  Other publications repeated the defamatory allegations from Modern Healthcare.[24]  In the face of BCBSTX's fraud accusations and Little River's financial instability due to BCBSTX's nonpayment of $65 million, employed physicians began leaving Little River, non-employed physicians stopped referring patients to Little River, and it became impossible for

---

[21] Final Award at ¶ 121.

[22] Final Award at ¶¶ 35,128.

[23]   https://www.modernhealthcare.com/article/20180623/NEWS/180629971/data-show-pattern-of-high-lab-charges-at-little-river-healthcare-hospitals.
https://www.modernhealthcare.com/article/20181206/NEWS/181209956/bankrupt-health-system-with-huge-lab-charges-closes-hospitals-clinics.
https://www.modernhealthcare.com/article/20181201/NEWS/181209998/provider-with-ties-to-lab-billing-scheme-may-close.

[24]https://www.texasobserver.org/how-can-you-do-this-to-people-after-rural-hospitals-close-in-milam-county-residents-scramble-to-find-care/ ("*Modern Healthcare,* a trade publication, has linked the Little River closures to the company's practice of overcharging insurers for lab tests to bolster its bottom line. Insurers, claiming that they were fleeced by the hospital group, are trying to recoup the money they overpaid, piling on debt to the company.); https://www.yourglenrosetx.com/news/20190729/losing-lifeline-what-happened-when-two-rural-hospitals-closed ("Shortly before it closed, Little River was accused of billing insurers for a high number of tests or expensive tests for out-of-state patients, according to the news outlet Modern Healthcare. Claiming Little River had violated terms of their contracts, insurers have refused to pay its lab claims or have tried to recoup money already paid.").

PLAINTIFFS' ORIGINAL COMPLAINT                 12

Plaintiffs to recruit new physicians to Little River.  Little River was forced to reduce services and lay off employees to cut expenses in an attempt to restructure.  The Georgetown Surgery Center was designed as a joint venture with physicians.  Plaintiffs were forced to abandon the project due to BCBSTX's accusations of fraud, which interfered with Little River's physician relationships and potential financing.  Likewise, due to BCBSTX's accusations of fraud, Little River was unable to obtain financing necessary to complete its restructuring.  Little River ultimately filed for bankruptcy and eventually liquidation.

38.     While Little River was closing hospitals, BCBSTX reported net income of over $1.3 billion in 2017 and $4 billion in 2018 with a surplus in the bank of $16.9 billion.[25]  BCSBTX's 2016 CEO, Patricia Hall, got paid $18 million in 2016, with her replacement, Paula Steiner, getting $14 million in 2017[26]—all while BCBSTX raised rates on Texas consumers by 60%.[27]  At least part of BCBSTX's net income was wrongfully obtained through its tortious actions against Little River and other rural Texas hospitals.

### D.     BCBSTX's Wrongful Actions Have Damaged Plaintiffs

39.     Plaintiff Jeffrey Madison was the Chief Executive Officer of Little River.  Plaintiff Jeff and Ashley Madison Trust ("*Madison Trust*") is the owner of 48.70% of the membership interest in Compass Pointe Holdings, LLC, the ultimate owner of 100% of the equity interest in Little River.  Collectively, Jeffrey Madison and the Madison Trust are referred to as "*Madison*."

40.     Plaintiff Ryan Downton ("*Downton*") was the Chief Legal Officer of Little River and President of the Little River Healthcare Holdings, LLC Board of Directors.  Downton is also the owner of 29.66% of the membership interest in Compass Pointe Holdings, LLC, the ultimate

---

[25] https://www.beckershospitalreview.com/payer-issues/health-care-service-corp-nets-4b-in-2018.html;
https://www.documentcloud.org/documents/5764214-Health-Care-Service-Corp-FY-2018.html.
[26] https://www.modernhealthcare.com/executive-compensation/health-care-service-corp-bosses-rake-green.
[27] https://patientsrising.org/health-care-service-blue-cross-bonuses/.

owner of 100% of the equity interest in Little River.  Since 2008, Downton also operated the Law Offices of Ryan Downton, whereby he provided legal services to physicians and hospitals outside of his employment with Little River.  Downton also previously owned and operated other healthcare entities.

41.     Plaintiff Peggy Borgfeld ("***Borgfeld***") was the Chief Financial Officer of Little River.  Borgfeld is also the owner of 16.09% of the membership interest in Compass Pointe Holdings, LLC, the ultimate owner of 100% of the equity interest in Little River.

42.     Plaintiff Kevin Owens was the founder of Little River Healthcare.  At various points in time, Kevin Owens also invested in or owned hospitals in Bastrop, Texas and Mangum, Oklahoma, invested in Blackhawk Healthcare, LLC (a rural hospital operator), and owned many medical imaging centers in Central Texas and the Houston region.  Plaintiff Kevin J. Owens Management Trust ("***Owens Trust***") is the owner of a 5.39% membership interest in Compass Pointe Holdings, LLC, the ultimate owner of 100% of the equity interest in Little River.  Collectively, Kevin Owens and the Owens Trust are referred to as "***Owens***."

43.     Plaintiffs have been injured by BCBSTX's actions in multiple ways.  First, BCBSTX's false and malicious statements about Little River prevented Plaintiffs from selling their equity interest in 2017 at a valuation exceeding $350 million.  Plaintiffs' equity is now worthless as Little River is in a Chapter 7 liquidation bankruptcy.  Second, BCBSTX's false and malicious statements about Little River have damaged each individual Plaintiff's business reputation and impacted their ability to obtain work.  Third, BCBSTX has damaged the Texas rural hospital market preventing Plaintiffs from being able to effectively compete through investment in other rural healthcare providers.  Fourth, BCBSTX's actions prevented the completion of the Georgetown Surgery Center, preventing Plaintiffs from profiting off of their intended investment.

44.     BCBSTX's wrongful actions include at least the following: First, using Little River's confidential information, BCBSTX explicitly encouraged its preferred laboratory provider, Quest Diagnostics, to "recruit" physicians who referred patients to Little River to get them to switch their referrals to Quest.  On information and belief, at BCBSTX's request, Quest told physicians that Little River's laboratory services were illegal and/or in violation of Little River's contracts with BCBSTX and the physicians should not refer to Little River.

45.     Second, BCBSTX directed other insurance companies to target Little River, stop paying it for lab services, and renegotiate their contracts with Little River to reduce payment amounts.  There are a limited number of health insurance companies in Texas, with BCBSTX (23.69%), United (14.61%), Humana (11.59%), Aetna (6.4%), and Cigna (3.59%) controlling approximately 60% of the market.[28]  Here, BCBSTX made at least one presentation to all of the major insurers in Texas wrongfully accusing Little River of fraud and directing the other insurers to target Little River.  BCBSTX knew that Little River would be forced to close if other insurers implemented rate cuts on the heels of BCBSTX's nonpayment.

46.     Third, BCBSTX wrongfully accused Little River of committing fraud in communications to CMS after BCBSTX discovered it had been wrongfully denying Little River laboratory claims.  Rather than admit its error and pay Little River's past-due claims, BCBSTX doubled-down on its strategy to shutdown Little River's laboratory operations by any means necessary—in this case by sending an email to CMS accusing Little River of fraud.

47.     Fourth, on information and belief, BCBSTX disparaged Plaintiffs and Little River to members of the Texas Legislature and the Texas Department of Insurance, accusing each hospital of committing fraud.  BCBSTX's reports about Little River were unjustified and made in

---

[28] Texas Department of Insurance 2018 Top 40 List of Insurers, https://www.tdi.texas.gov/company/top40.html.

bad faith and/or with malice.

48.     Fifth, BCBSTX stopped paying Little River, and dozens of other laboratory service providers in Texas, by instituting a "Prepayment Review Audit" in violation of Texas law.

49.     BCBSTX's goal throughout its entire campaign against Little River was to force Plaintiffs and Little River out of the laboratory business, increasing market share for its preferred provider, Quest, increasing its opportunities to employ physicians, and, presumably, increasing BCBSTX's profit margin.

## V.  CONDITIONS PRECEDENT

50.     All conditions precedent to recovery have been performed or have occurred.

## VI.  CAUSES OF ACTION

### COUNT 1
### VIOLATION OF THE LANHAM ACT

51.     Plaintiffs incorporate the foregoing paragraphs by reference.

52.     The Lanham Act (15 U.S.C. § 1125(a)) applies when a party disparages the commercial activities of another party in connection with any goods or services.  Any person who believes that he or she has been damaged by such act has standing to bring a claim, not merely the main target of the disparaging statements.  Plaintiffs have suffered damages through loss of business opportunities and loss of the value of their equity in Little River.

53.     BCBSTX made false and misleading commercial statements about laboratory testing offered by Little River including, at a minimum, the following:

> (1) On information and belief, BCBSTX directed its agent, Quest Diagnostics, to recruit physicians away from Little River by means of false statements;

> (2) BCBSTX made at least one presentation to other insurance companies falsely accusing Little River of committing fraud, with knowledge that such statements were false;

> (3) BCSBTX shared the false presentation with at least one insurer in writing; and

(4) BCBSTX made false accusations regarding Little River committing fraud, with knowledge that such statements were false, to regulatory stakeholders.

54.     BCBSTX is not entitled to any privilege or qualified privilege because its false statements were made in bad faith and/or with malice.

55.     The false statements had the capacity to deceive a substantial segment of potential consumers.  More specifically, Little River had three relevant markets for its services: physicians, insurance companies, and Medicare/CMS.  Little River needed physicians to refer patients for services and contracts with insurance companies and Medicare to pay for those services. BCBSTX's actions show an organized campaign to both penetrate the physician market and disrupt Little River's relationships with other insurance companies and Medicare in a way that harmed Little River.  First, BCBSTX acted in concert with Quest to expand Quest's share of the Texas laboratory market by, on information and belief, giving physicians false information about Little River.  Second, BCBSTX gave a presentation to insurers telling them to target Little River based on false allegations that Little River was committing fraud and then emailed that presentation to at least one insurer.  Third, BCBSTX emailed CMS accusing Little River of fraud.  Each of these individual communications had the capacity to deceive a substantial segment of potential consumers.

56.     BCSBTX's deception was material in that no insurer or physician, let alone Medicare, will do business with an individual or hospital that is committing fraud.

57.     Little River provided laboratory testing both within and outside of Texas and owned a laboratory in Illinois that processed Texas samples.  Accordingly, Little River's laboratory services were in interstate commerce.

58.     Plaintiffs have been damaged as a result of BCBSTX's false statements.  First, as the owners and officers of Little River Healthcare, Madison, Downton, Borgfeld, and Owens's

personal business reputation and future business opportunities were damaged by BCBBSTX's false statements about Little River.  Madison, Downton, and Borgfeld provide services to hospitals and physicians.  Madison was generally recognized as the face of Little River.  Downton was publicly associated for the Little River brand and regularly served as its spokesperson in media interviews, including interviews about the dispute with BCBSTX.  Further, prior to his relationship with Little River, Madison provided services to other rural hospitals and Downton represented physicians and other healthcare providers and also owned, operated, and eventually sold another healthcare business.  Owens was widely known as the founder of Little River.  In short, BCBSTX's false accusations of fraud damaged Plaintiffs' reputation for providing legal, managerial services, and investment services to physicians and hospitals, making it more difficult to obtain work and/or find investment opportunities, causing a reduction in income.  For instance, one prominent hospital in Austin requires employees to sign a certification that they have no knowledge of Little River's laboratory billing as a condition of employment.  Madison, Downton, and Borgfeld cannot sign such a certification.  The stain on Plaintiffs' reputation will remain forever despite the recent Arbitration award against BCBSTX.

59.     Second, BCBSTX's false statements prevented Plaintiffs from selling their equity interests in Little River based on a value in excess of $350 million in 2017.

60.     Third, BCBSTX's false statements prevented completion of the Georgetown Surgery Center, which would have allowed each Plaintiff to individually profit separate from their investments in Little River.

61.     Fourth, BCBSTX's false statements ultimately resulted in the closure of Little River's medical facilities and elimination of Plaintiffs' entire equity value.  BCBSTX's false statements to physicians, insurance companies, and regulators damaged Little River's business

reputation and prospects, resulting in the diminution of the value of Plaintiffs' equity in Little River.[29]

62.      In addition to damages sustained by Plaintiffs, as described above, Plaintiffs seek disgorgement of BCBSTX's profits resulting from its false advertising pursuant to 15 U.S.C. § 1117(a).  By making false statements about Little River and other rural hospitals, BCBSTX forced such hospitals out of the laboratory business and/or forced such hospitals to close.  As a result of the hospitals' cessation of laboratory services and/or closure, BCBSTX wrongfully profited by paying less for lab services.  Healthcare Service Corporation, the legal entity of which BCBSTX is an unincorporated division, made more than $1.3 billion in net income in 2017 and more than $4 billion in net income in 2018.  As a matter of equity, and in compliance with 15 U.S.C. § 1117(a), BCBSTX should be required to disgorge the profits resulting from its wrongful actions in an amount to be determined by the Court.

63.      Most of BCBSTX's statements in violation of the Lanham Act were made within the last four years.  To the extent any preceded the filing of this Complaint by more than four years, the discovery rule applies because any such statements at issue were not known by Plaintiffs prior to filing of the Final Award and are not public knowledge.

## COUNT 2
## DEFAMATION

64.      Plaintiffs incorporate the foregoing paragraphs by reference.

65.      BCBSTX published false statements about Little River and, by implications, its owners and officers.  Specifically, BCBSTX published at least the following false statements:

---

[29] Plaintiffs do not seek recovery of the "Enterprise Value" of Little River, which is equal to Little River's equity value plus Little River's debt.  To the extent BCBSTX damaged Little River by causing increased levels of debt, consulting expenses, and/or bankruptcy expenses, such damage claims are the property of the Little River bankruptcy estate and are not at issue in this litigation, which is explicitly limited to loss of opportunity to sell individually owned equity and loss of individually owned equity value in membership interests, which are not part of the bankruptcy estate.

(1) On information and belief, directives to its agent, Quest Diagnostics, to recruit physicians away from Little River by means of false statements;

(2) Submitting a report to the OIG falsely accusing Little River of fraud without including Little River's explanation of the legality of its business;

(3) At least one presentation to other insurance companies falsely accusing Little River of committing fraud, with knowledge that such statements were false;

(4) Sharing the false presentation with at least one insurer in writing;

(5) Emails to CMS falsely accusing Little River of committing fraud, with knowledge that such statements were false; and

(6) On information and belief, falsely accusing Little River of committing fraud in statements to elected officials and regulators.

66. BCBSTX is not entitled to any privilege or qualified privilege because its false statements were made in bad faith and/or with malice

67. Under Texas law, statements falsely accusing a company of fraud are deemed statements about the company's owners.  In this case, anyone who knew any of the individual Plaintiffs would equate statements accusing Little River of fraud with statements accusing each individual Plaintiff of committing fraud.

68. BCBSTX acted negligently with respect to all six false statements and with gross negligence and/or malice in making, at a minimum, false statements 3, 4, and 5 as set forth in ¶66.

69. In addition to general damages for loss of reputation and mental anguish for all individual palintiffs, Madison, Downton, and Borgfeld also suffered special damages through job loss and difficulty finding new work.  Downton and Owens suffered special damages through the loss of investment opportunities.

70. The discovery rule applies to defamation claims when the statements at issue are not public knowledge.  Plaintiffs were not aware of BCBSTX's defamatory statements and the statements were not public knowledge until Little River filed the Final Award from the Arbitration

in open court on May 6, 2020.

## COUNT 3
## BUSINESS DISPARAGEMENT

71.     Plaintiffs incorporate the foregoing paragraphs by reference.

72.     BCBSTX published false and disparaging statements about Little River and, by implications, its owners and officers.  Specifically, BCBSTX published at least the following false statements:

> (1) On information and belief, directives to its agent, Quest Diagnostics, to recruit physicians away from Little River by means of false statements;

> (2) Submitting a report to the OIG falsely accusing Little River of fraud without including Little River's explanation of the legality of its business;

> (3) At least one presentation to other insurance companies falsely accusing Little River of committing fraud, with knowledge that such statements were false;

> (4) Sharing the false presentation with at least one insurer in writing;

> (5) Emails to CMS falsely accusing Little River of committing fraud, with knowledge that such statements were false; and

> (6) On information and belief, falsely accusing Little River of committing fraud in statements to elected officials and regulators.

73.     BCBSTX is not entitled to any privilege or qualified privilege because its false statements were made in bad faith and/or with malice.

74.     While a claim for defamation provides redress to injury to a person's reputation, a claim for business disparagement provides redress to injury to a person's economic interests.  Plaintiffs suffered special damages through economic losses.  First, beginning in the Spring of 2016 and continuing until early 2017, Plaintiffs endeavored to sell a controlling interest in Little River Healthcare.  At least four investment banks valued the equity value of Little River at an amount in excess of $350 million.  There was significant interest in Little River from a variety of private equity funds.  Unfortunately, Plaintiffs were forced to terminate the sale process in early

2017 due to BCBSTX's business disparagement.  In the absence of BCBSTX's business disparagement, it is likely Plaintiffs would have sold their equity in Little River based on an equity valuation in excess of $350 million.  Today, Little River is in bankruptcy and Plaintiffs' equity interest is worthless.

75.     Madison, Downton, and Borgfeld also suffered special damages through job loss and difficulty finding new work.  Additionally, as Madison, Downton, and Owens invested in rural healthcare businesses, they lost their opportunity to continue in that business due to BCBSTX's defamatory conduct.

76.     The discovery rule applies to business disparagement claims when the statements at issue are not public knowledge.  Plaintiff were not aware of BCBSTX's specific defamatory statements and the statements were not public knowledge until Little River filed the Final Award from the Arbitration in open court on May 6, 2020.

## COUNT 4
## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS

77.     Plaintiffs incorporate the foregoing paragraphs by reference.

78.     Absent BCBSTX's tortious actions, it is likely the Georgetown Surgery Center would have been built with Plaintiffs as key investors.  The plans to build the Georgetown Surgery Center were aborted due to the malicious and intentional acts of BCBSTX, which were done with an intent to prevent Plaintiffs and Little River from expanding and building new relationships with physicians.  As a result of cancellation of the Georgetown Surgery Center project, Plaintiffs have been damaged.

## COUNT 5
## UNFAIR COMPETITION

79.     Plaintiffs incorporate the foregoing paragraphs by reference.

80.     BCSBTX's actions as set forth above constitute business conduct which is contrary

to honest practice in commercial matters and, therefore, unfair competition under Texas law.  In short, BCBSTX's illegal acts interfered with Plaintiffs' ability to conduct their business.  By virtue of BCBSTX's unfair competition, Plaintiffs were deprived of their ability to sell a majority equity interest in Little River for a valuation exceeding $350 million.

81.     The discovery rule applies to unfair competition claims when the statements at issue are not public knowledge.  Plaintiffs were not aware of BCBSTX's specific defamatory statements and the statements were not public knowledge until Little River filed the Final Award from the Arbitration in open court on May 6, 2020.

## COUNT  6
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

82.     Plaintiffs incorporate the foregoing paragraphs by reference.

83.     BCBSTX's intentional and/or reckless actions, as set forth above, were extreme and outrageous and caused each individual plaintiff severe emotional distress, with negative impacts on each plaintiff and their families.  For instance, various plaintiffs contemplated suicide, lost sleep, experienced marital discord, and/or moved out of Texas as a result of BCBSTX's actions.

## COUNT  7
## EXEMPLARY DAMAGES

84.     Plaintiffs incorporate the foregoing paragraphs by reference.

85.     Exemplary damages may be awarded when the harm to a plaintiff results from: (1) fraud; (2) malice; or (3) gross negligence.  BCBSTX's defamation, business disparagement, and violations of the Lanham Act all resulted from malice and/or gross negligence.  Accordingly, Plaintiffs seek an award of exemplary damages.

## VII.  ATTORNEYS' FEES

86.     Plaintiffs also seek recovery of their reasonable attorneys' fees in this matter.

## VIII.  JURY DEMAND

87.     Plaintiffs demand a trial by jury.

## IX. PRAYER

88.     Plaintiffs pray and demand that judgment be entered in their favor and against

Defendants as follows:

(a)     damages in an amount to be determined;

(b)     treble damages pursuant to 15 U.S.C. § 1117(a);

(c)     exemplary damages;

(d)     prejudgment and post-judgment interest as allowed by law;

(e)     attorneys' fees and costs of court; and

(f)     such other and further relief deemed appropriate by the Court.

Respectfully submitted,


/s/ Ryan Downton
Ryan Downton
RYAN DOWNTON, P.C.
Texas Bar No. 24036500
6300 Isla Verde Ave., Ste. 907
Carolina, PR 00979
Phone: 512-680-7947
Rdownton1@gmail.com

*Attorneys for Plaintiffs*